## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## (BOSTON DIVISION)

| | |
|---|---|
| DAWN CROSBY-KORZENIOWSKI and ALISON CROSBY-KORZENIOWSKI, ) ) ) | CIVIL ACTION NO.: |
| Plaintiffs, ) ) | **COMPLAINT AND JURY DEMAND** |
| v. ) ) | |
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC., ) ) ) ) ) | |
| Defendants. ) ) | |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiffs Dawn Crosby-Korzeniowski and Alison Crosby-Korzeniowski, filing this Complaint seeking judgment against Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. (hereinafter collectively referred to as "Defendants") for personal injuries suffered as a result of Ms. Dawn Crosby-Korzeniowski's use of Defendants' Johnson's Baby Powder and Shower to Shower (hereinafter collectively referred to as the "Products") containing talcum powder, which were manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Defendants.

## INTRODUCTION

1.     This action arises from Defendants' failures to warn about serious health risks associated with the use of talcum powder when applied to women's perineal and perineum

regions, as well as to diaphragms, underwear and sanitary napkins.

2.     Defendants failed to warn consumers, health care providers, and the public of serious injuries associated with the use of talcum powder in women's perineal and perineum regions, including increased incidence of ovarian cancer. If the Defendants had timely and adequately warned Ms. Dawn Crosby-Korzeniowski of this risk information, Ms. Dawn Crosby-Korzeniowski's injuries would have been avoided.

3.     Not only did Defendants fail to warn about talcum powder's serious health risks, they also falsely advertised, warranted and represented that talcum powder was safe and effective for the foreseeable and intended use of application of the powder to women's perineum region and undergarments to prevent odor, remove moisture, and provide comfort.

## PARTIES

4.     The Plaintiffs, Dawn Crosby-Korzeniowski and Alison Crosby-Korzeniowski, are domiciled in Massachusetts and reside in the city of Mattapoisett in Plymouth County. At all relevant times, Plaintiffs Dawn Crosby-Korzenioski and Alison Crosby-Korzeniowski were and are married. At all times pertinent, including usage of Johnson's Baby Powder and Shower to Shower, as well as diagnosis and treatment of her ovarian cancer, the Plaintiff, Dawn Crosby-Korzeniowski was a resident of Mattapoisett and Bridgewater, Plymouth County, Massachusetts; Fall River and Westport, Bristol County Massachusetts as well as Providence, Providence County, Rhode Island, Warwick and Coventry, Kent County, Rhode Island.

5.     Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all pertinent times, Johnson & Johnson did business in the Commonwealth of Massachusetts. Johnson & Johnson may be served with process of this Court via service on its registered

agent, located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

6.    Defendant Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. ("Johnson & Johnson Consumer"), is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. At all pertinent times, Johnson & Johnson Consumer did business in the Commonwealth of Massachusetts and is registered with the Commonwealth of Massachusetts Secretary of State. Johnson & Johnson Consumer may be served with process of this Court via service on its registered agent, located at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

7.    At all pertinent times, Johnson & Johnson Consumer[1] has been a wholly owned subsidiary of Johnson & Johnson under the complete dominion and control of Johnson & Johnson.

8.    Johnson & Johnson Consumer formulated, manufactured, marketed, tested, promoted, sold, and distributed Johnson's Baby Powder.

9.    Unless otherwise specified, Johnson & Johnson and Johnson & Johnson Consumer shall be collectively referred to as the "Johnson & Johnson Defendants or Defendants."

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Defendants are citizens of a state other than the state in which Ms. Dawn Crosby-Korzeniowski was a citizen at the time of her injury.

11.    Venue in this Court is proper under 28 U.S.C. 1391(b)(2) because a substantial part of the

---

[1] All allegations regarding actions taken by Johnson & Johnson Consumer Inc. also include actions taken while that entity was known as Johnson & Johnson Consumer Companies, Inc.

events or omissions giving rise to this claim occurred in this judicial district.

## TAG-ALONG ACTION

12.     This is a potential tag-along action and in accordance with 28 U.S.C. §14-7, it should

be transferred to the United States District Court for New Jersey for inclusion in *In re Johnson*

*& Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability*

*Litigation*, MDL #2738 (Hon. Freda L. Wolfson).

## HISTORY OF TALC PRODUCTION

13.     Talc, magnesium trisilicate, is an inorganic mineral mined from the earth.

14.     Imerys Talc America, Inc. (hereinafter "Imerys") mined the talc at issue in this case

and supplied the Material Safety Data sheets ("MSDS"), containing health and warning

information, for talc. Talc is the main substance in talcum powder, and talcum powder is the

main ingredient in Defendants' Johnson's Baby Powder and Shower to Shower, the Products

at issue in this case. Johnson's Baby Powder is composed almost entirely of talc.

15.     At all pertinent times, Johnson & Johnson Defendants were engaged in the

business of manufacturing, marketing, testing, promoting, selling, and/or distributing

Johnson's Baby Powder and Shower to Shower.

16.     In 1893, Johnson & Johnson developed Johnson's Baby Powder as a daily use

powder intended to eliminate friction and absorb unwanted excess moisture on the skin for

both babies and women.

17.     Since Johnson's Baby Powder introduction, Johnson & Johnson Defendants

have consistently marketed it for use by women to maintain freshness and cleanliness.

Historically, the Baby Powder label and advertising encouraged women to dust themselves

with the Baby Powder daily to mask odors.

18.     For more than a century, Johnson's Baby Powder has been a symbol of freshness, cleanliness, and purity. Since the inception of Johnson's Baby Powder, Johnson & Johnson Defendants advertised and marketed the Product as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness," helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild." Johnson & Johnson Defendants compelled women through advertisements to dust themselves with its Product to mask odors. Throughout the history of Johnson's Baby Powder, the bottle has specifically targeted women: "[f]or you, use every day to help feel soft, fresh, and comfortable."

19.     Although the label has changed over time, the message is the same: Johnson's Baby Powder is safe for use by women as well as babies. The Baby Powder label currently states that the Product "... gently absorb[s] excess moisture helping skin feel comfortable. Our incredibly soft, hypoallergenic, dermatologist and allergy tested formula glides over skin to leave it feeling delicately soft and dry while providing soothing relief." Consumers are instructed to "[s]hake powder directly into your hand, away from the face, before smoothing on the skin."

20.     Through other marketing, including on their website for Johnson's Baby Powder, Johnson & Johnson Defendants similarly encouraged women to use the Product daily. Johnson & Johnson Defendants state that Johnson's Baby powder "keeps skin feeling soft, fresh and comfortable. Johnson's Baby Powder helps eliminate friction while keeping skin cool and comfortable. It's made of millions of tiny slippery plates that glide over each other to help reduce the irritation caused by friction." Under a heading "How to Use," "apply Johnson's Baby Powder close to the body, away from the face. Shake the powder into your hand and smooth onto skin." Under a heading "When to use," Johnson & Johnson

Defendants recommend "[f]or baby use after every bath and diaper change," and "[f]or you, use anytime you want skin to feel soft, fresh, and comfortable."

21.    Johnson & Johnson Defendants seek to convey an image of a safe and trusted family brand, by using language on their website for Johnson's Baby Powder, claiming the Product is "[c]linically proven to be safe, gentle and mild."

22.    Johnson & Johnson Defendants registered the term "Shower to Shower" as its trademark for talcum powder on March 28, 1966. Shower to Shower was test-marketed in New Orleans and Indianapolis in late 1966, and then extended to New England, the Middle and South Atlantic States and Massachusetts in May1967. Since July 1967, distribution has been nationwide. See Johnson & Johnson v. Colgate-Palmolive Co., 345 F. Supp. 1216 (D. N.J. 1972).

23.    Johnson & Johnson Defendants advertised and marketed Shower to Shower as safe for use by women "all over your body," as evidenced by the slogan "[a] sprinkle a day keeps odor away," and "[y]our body perspires in more places than just under your arms. Use Shower to Shower to feel dry, fresh and comfortable throughout the day." and "Shower to Shower can be used all over your body." Johnson & Johnson Defendants' website included the suggested use of the Products "Shower to Shower" in the genital area with the following: "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

24.    Johnson & Johnson Defendants also have a website, www.safetyandcarecommitment. com devoted to "Safety & Care commitment." The website has changed over time. Previously, Johnson & Johnson Defendants claimed "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care Products from the Johnson & Johnson

Family of Consumer Companies is safe and effective when used as directed," backed by a "Five-Level Safety Assurance Process." The "Five-Level Safety Assurance Process" stated that "for decades, ours has been one of the most thorough and rigorous Product testing processes in our industry- to ensure safety and quality of every single Product we make." Included on this page was Johnson & Johnson Defendants' so-called "Promise to Parents and their Babies" that "[w]hen you bring our baby care Johnson's Baby Powder into your home, you can be assured of our commitment to the safety of your family and families around the world."

25.     Today, on Johnson & Johnson Defendants' website www.safetyandcarecommitment. com, "safety is our priority", and "[o]ur goal is to exceed the safety standards in every country where our Products are sold." Johnson & Johnson Defendants market their safety assurance process as "one of the most stringent in the world," purportedly "ensuring the safety and quality of every baby and beauty personal care Products we make." Within this website, Johnson & Johnson Defendants devote an entire section to talc, as "decades of science have reaffirmed its safety" and "[b]ecause of its safety and effectiveness, we confidently include pharmaceutical grade talc in our Products." Johnson & Johnson Defendants close by stating "[w]e take any questions about our Products' safety seriously and as a result have dug deep into evidence and science on talc."

26.     The www.safetyandcarecommitment.com also touts the safety of talc,  "[w]e continue to use talc in our Products because decades of science have reaffirmed its safety. Because of its safety and effectiveness, we confidently include the finest-grade talc in our Products. Your trust in our Products and your confidence using them every day is a huge responsibility - that's why we rely on scientific research to deliver the safest possible

Products. Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc." Further, "[f]ew ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc." Nowhere do Johnson & Johnson Defendants warn of the increased risk of ovarian cancer linked to the use of Johnson's Baby Powder.

27.     Johnson & Johnson Defendants also have another website, "Facts About Talc", http://www.factsabouttalc.com/, dedicated to providing consumers with safety information: "[w]e want all the information we can get. We seek out the guidance of experts and we monitor the latest science to see if it impacts any of our Products. We also listen to the people who use our Products so we can take their experiences into account. Safety is a priority for all of our consumer Products ... Safety is a value we all share." The website goes on to say "[w]e go beyond the findings of a single study because we must ensure we've assembled all of the available data from multiple scientific areas to reach conclusions based on evidence. One opinion or study can't outweigh decades of conclusive, scientific, evidence-based findings. As a scientist and, equally important, as a parent myself, I can tell you the science is clear: Cosmetic talc is, and has been, safe for use in consumer Products."

28.     Included on the "Facts About Talc" website is the Nurses' Health Study and the Women's Health Initiative Study, stating "the study data showed no increased risk of ovarian cancer in women ... There was also no increase in risk among women who used powder for longer periods of time." Nowhere in the discussion of this study are the actual percentages of women who contracted ovarian cancer the study periods listed, and nowhere does the website list ovarian cancer as a possible side effect of continued talcum powder use.

29.     On October 14, 2016, the Johnson & Johnson Defendants issued the following statement: "[a]t Johnson & Johnson, nothing is more important than ensuring our Products are safe. Science, research, clinical evidence, and decades of studies by medical experts around the world continue to support the safety of the cosmetic talc used in Johnson's Baby Powder" *See* Press Release, Johnson & Johnson, *Talcum Powder: A Message About Safety* (Oct. 14, 2016) available at https://www.jnj.com/latest-news/tara-glasgow-statement-talcum-powder.

30.     On the page where the October 14, 2016 press release is located, Johnson & Johnson Defendants include a video of Tara Glasgow, current Vice President of Research & Development at Johnson & Johnson Consumer, discussing the importance of safety at Johnson & Johnson. In particular, the video focuses on the "continuing safety" of Johnson's Baby Powder and its main ingredient, talcum powder. Nowhere do Johnson & Johnson Defendants warn of the increased risk of ovarian cancer linked to the use of Johnson's Baby Powder on a women's perineal and/or perineum area.

31.     As detailed below, beginning in at least 1972, Johnson & Johnson Defendants were aware of several studies demonstrating that use of talc-based powder in the genital area correlated to a significant increased risk of ovarian cancer. Since 1972, there have been at least twenty-one studies (including nineteen case-control studies, one cohort study, and one combined case-control and cohort study) that reported an elevated risk for ovarian cancer with genital talc use. The majority of these studies show a statistically significant increased risk of ovarian cancer.

32.     In light of the findings in these studies, Johnson & Johnson Defendants do not warn or inform consumers anywhere, including on the Products labeling or in its marketing

or advertising for the Products, that use of Johnson's Baby Powder may be harmful to health, specifically the significant increased risk of ovarian cancer.

33.     Interestingly, in internal documents, the Johnson & Johnson Defendants acknowledged over the course of decades, notice of the talc/ovarian cancer issue and that if any scientific studies questioned the safety of talc use, Johnson & Johnson would "not hesitate to take it off the market."

## SCIENTIFIC LITERATURE PROVES LINK BETWEEN TALC USAGE AND OVARIAN CANCER

34.     Research published in 1961 established that particles, like talc, can translocate from the exterior genital area to the ovaries in women. *See* G.E. Egli, and Michael Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract,* 12 FERTILITY STERILITY 2,151-155 (1961).

35.     Due to talc's potential for transmission, researchers remained concerned about its carcinogenic nature and the effects of use. In 1968, a study concluded that "[a]ll of the 22 talcum Products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits ... Unknown significant amounts of such materials in Products that may be used without precautions may create and unsuspected problem." L. J. Cralley et al., *Fibrous and Mineral Content of Cosmetic Talcum Products,* 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968). A 1976 follow-up study concluded that "[t]he presence in these Products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these Products." Arthur

Rohl, et al., *Consumer talcums and powders: mineral and chemical characterization,* 2 JTOXICOL ENVIRON HEALTH 255-284 (1976).

36.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by W. J. Henderson in Cardiff, Wales. That study found talc particles "deeply embedded" in ten of thirteen ovarian tumors, twelve of twenty-one cervical tumors, one primary carcinoma of the endometrium and five of twelve "normal" ovaries from women with breast cancer. W. J. Henderson et al., *Talc and carcinoma of the ovary and cervix,* 78 J. OBSTET. GYNAECOL. BR. COMMW. 3, 266-272 (1971).

37.     The scientific evidence linking talc use and ovarian cancer continued to build in the next decade. In 1982, the first epidemiologic study was led by Dr. Daniel Cramer on talc powder use in the female genital area. The National Institutes of Health ("NIH") funded a case-control study that found a statistically significant 92% increased risk in ovarian cancer with women who reported genital talc use. Additionally, it found that talc application directly to the genital area around the time of ovulation might lead to talc particles becoming deeply imbedded in the tissues of the ovary, and perhaps causing foreign body reaction capable of causing growth of epithelial ovarian tissue. This study proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer. Daniel Cramer et al., *Ovarian cancer and talc: a case control study, 50* CANCER 372-376 (1982).

38.     In 1983, Patricia Hartge and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washing University Medical Center, performed a case-control interview study regarding ovarian cancer. Although no association was proven due to the small sample size, the study found an "excess relative risk" of 2.5 (95% CI=0.7 to 10.0) of

ovarian cancer for women who use talc in the genital area. Patricia Hartge et al., *Talc and ovarian cancer,* 250 JAMA 1844 (1983) available at http://jamanetwork.com/journals/jama/article-abstract/1725023.

39.    In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 controls found that 52% of the cancer patients habitually used talc on the perineum before their cancer diagnosis. The study showed that women using talc daily on their perineum had 1.45 times the risk of ovarian cancer then women that did not use talc daily, showing a positive dose-response relationship. Alice Whittemore et al., *Personal and environmental characteristics related to epithelial ovarian cancer:  II. Exposures to talcum powder, tobacco, alcohol, and coffee,* 128 AM. J. EPIDEMIOL. 6, 1228-1240 (1988).

40.    A case control study conducted in 1989 found similar results. The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found an increased risk in ovarian cancer with women who reported genital talc powder use more than once per week. Margaret Booth et al., *Risk factors for ovarian cancer:  a case-control study,* 60 BR. J.CANCER 4, 592-598 (1989).

41.    Another case control study conducted in 1989 by Bernard Harlow of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing, and a statistically significant increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum. This study also found a positive dose-response relationship. Bernard Harlow and Neinke Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc,* 130 AM. J. EPIDEMIOL. 2, 390-394 (1989).

42.    A 1992 study, also by Dr. Harlow, found that frequent and long-term talc use directly

on the genital area during ovulation increased a woman's risk of ovarian cancer threefold. The study also found "[t]he most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals). Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." This study looked at 235 ovarian cancer cases compared to 239 controls, concluding that "given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk,* 80 OBSTET. GYNECOL. 1, 19-26 (1992).

43.    Also in 1992, a case-control study was conducted by Karin Rosenblatt at the Department of Epidemiology of John's Hopkins School of Hygiene and Public Health. This study showed that the development of ovarian cancer may be associated with genital fiber exposure (especially talc on sanitary napkins), and a relative risk of 4.8 for ovarian cancer development from talc use on sanitary napkins. Karin Rosenblatt et al., *Mineral fiber exposure and the development of ovarian cancer,* 45 GYNECOL. ONCOL. 20-25 (1992).

44.    Another 1992 case-control study conducted by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China,* 21 INT. J. EPIDEMIOL. 23-29 (1992).

45.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats." Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice*

*(Inhalation studies),* Technical Report Series No. 421 (Sept. 1993).

46.     In 1995, a case control study conducted in Australia by David Purdie, involving over 1600 women found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum. David Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study,* 62 INT. J. CANCER 6, 678-684 (1995).

47.     In 1996, a case-control study similarly found a statistically significant increased risk of ovarian cancer in women who used talc-based powders in their genital area. See Asher Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer,* 65 FERTIL. STERIL. 1, 13-18 (1995).

48.     In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer, "[c]oncem about talc as an ovarian carcinogen goes back 50 years in the medical literature. By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer." Marie McCullough, *Women's health concerns prompt condom makers to stop using talc,* Jersey Journal (City Ed.) (Jan. 10, 1996).

49.     In 1997, a case-control study of 313 women with ovarian cancer and 422 controls found that the women with cancer were more likely to have applied talc powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Linda Cook et al., *Perineal powder exposure and the risk of ovarian cancer,* 145 AM. J. EPIDEMIOL. 459-465 (1997).

50.     In 1997, a case-control study conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine, which

14

included over 1,000 women found a statistically significant increased risk for ovarian cancer for women who applied talc via sanitary napkins to their perineum. The study indicated that "[c]ommercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc. When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found," concluding "[t]he results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated." Stella Chang and Harvey Risch, *Perineal talc exposure and risk of ovarian carcinoma,* 79 CANCER 12, 2396-2401 (1997).

51.    A 1998 case-control study conducted in Canada by Beatrice Godard found increased risk of ovarian cancer in women who used talc-based powders on their perineum. Beatrice Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study,* 179 AM. J. OBSTET. GYNECOL. 2, 403-410 (1998).

52.    In 1999, Dr. Cramer conducted a case-control study of 563 women newly diagnosed with epithelial ovarian cancer and 523 controls. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum: "[w]e conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute ("NCI"). Daniel Cramer et al., *Genital talc exposure and risk of ovarian cancer,* 81 INT. J. CANCER 3, 351-356 (1999).

53.    In 2000, Roberta Ness, from University of Pennsylvania, led a case control study of

over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation, and that inflammation contributes to cancer cell development. Roberta Ness et al., *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer,* 11 EPIDEMIOLOGY 2, 111-117 (2000).

54.     Also in 2000, a prospective cohort study found a 40% increase in invasive serous cancers from women who applied talc to their perineum. Dorota Getrig et al., *Prospective Study of Talc Use and Ovarian Cancer,* 92 J. NATL. CANCER INST. 3, 249-252 (2000).

55.     In 2003, a meta-analysis was conducted which re-analyzed data from 16 studies published prior to 2003, finding a 33% increase in ovarian cancer risk among talc users. Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies,* 23 ANTICANCER RES. 2C, 1955-60 (2003).

56.     In 2004, a case-control study of nearly 1400 women from twenty-two counties was performed in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use, compared with women using cornstarch powders as "[c]ornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded that "users should exercise prudence in reducing or eliminating use", and "the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures,

talcum powder use is easily avoidable." Paul Mills et al., *Perinea/ talc exposure and epithelial ovarian cancer risk in the Central Valley of California,* 112 INT. J. CANCER 458-64 (2004).

57.     In a 2007 study by Amber Buz'Zard, talc was found to increase proliferation, induce neoplastic transformation and increase reactive oxygen species (ROS) generation time-dependently in the ovarian cells. The study concluded that talc may contribute to ovarian carcinogenesis in humans. The data suggested that talc may contribute to ovarian neoplastic transformation and Pycnogenol reduced the talc-induced transformation. Amber Buz'Zard et al., *Pycnogenal reduces talc-induced neoplastic transformation in*m *human ovarian cell cultures,* 21 PHYTOTHERAPY RES. 6, 579-86 (2007).

58.     In 2008, Margaret Gates performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study (the "Gates Study"). This study was funded by NCI, and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use. A 60% increased risk of the serous invasive subtype was also found. Dr. Gates noted a pronounced and positive dose-response relationship, increasing risk with increasing talc usage by women. These results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer . . . the finding of highly significant trends between increasing frequency of use and risk 'strengthen[ing] the evidence of an association, because most previous studies have not observed a dose response.'" Notably, the study promoted an alternative to talc, cornstarch, which "has not been shown to increase ovarian cancer risk…." The study concluded that "women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk. Physicians should ask the patient about talc use history and should advise the patient to

discontinue using talc in the genital area if the patient has not already stopped." Margaret

Gates et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of*

*Epithelial Ovarian Cancer,* 17 CANCER EPIDEMIOL, BIO. & PREV. 9, 2436-2444

(2008).

59.     In October of 2008, Michael Thun, Vice-President of Epidemiology and

Surveillance Research at the American Cancer Society, commented on the Gates Study. He

stated that the dose-response relationship between talc and ovarian cancer had finally been

confirmed by this study: "[t]here are very few modifiable risk factors for ovarian cancer.

The main one is the use of oral contraceptives, which has been clearly established to lower

the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then

there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc

fits in, alongside asbestos, postmenopausal hormone therapy, and radiation." Zosia

Chustecka and Desiree Lie, *Talc Use in Genital Area Linked to Increased Risk for Ovarian*

*Cancer,* Medscape Medical News (Oct. 8, 2008) available at http://www.medscape.com/

viewarticle/581781.

60.     In 2008, Melissa Merritt from the Australian Cancer Study and Australian

Ovarian Cancer Study Group conducted a case-control study of over 3,000 women finding

a statistically significant increased risk of ovarian cancer for women who used talc on their

perineum was confirmed. This study also confirmed a statistically significant increased risk

of ovarian cancer of a serous subtype in women who used talc on their perineum. Melissa

Merritt et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of*

*epithelial ovarian cancer,* 122 INT. J. CANCER 1, 170-176 (2008).

61.     In 2009, a case-control study of over 1,200 women found the risk of ovarian

cancer increased significantly with frequency and duration of talc use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use. In conclusion the study stated, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Anna Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County,* 124 INT. J. CANCER 6, 1409-1415 (2009).

62.     In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Karin Rosenblatt et al., *Genital powder exposure and the risk of epithelial ovarian cancer,* 22 CANCER CAUSES & CONTROL 5,737- 42 (2011).

63.     In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Kathryn Terry et al., *Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls,* 6 CANCER PREV. RES. 8,811 (2013).

64.     In May 2015, Roberta Ness performed a meta-analysis of all accumulated epidemiologic evidence (23 case-control studies, 5 meta-analyses, and 3 analyses of a single cohort). Talc use was found to increase ovarian cancer by 30-60% in almost all well-designed studies. The results were published in the International Journal of

Gynecological Cancer. Roberta Ness, *Does talc exposure cause ovarian cancer?,* 25 INT'L. J. CANCER 1, 51 (2015).

65.    A 2016 study of African-American women found that body powder was significantly associated with Epithelial Ovarian Cancer. Genital powder was associated with an increased risk of EOC (OR= 1.44; 95% CI, 1.11-1.86) and a dose-response relationship was found for duration of use and number of lifetime applications *(P* < 0.05). The study concluded that body powder is a modifiable risk factor for epithelial ovarian cancer among African-American women. Joellen Schildkraut et al, *Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES),* 25 *CANCER EPIDEMIOL., BI0MARKERS & PREV. 10, 1411 (2016).*

66.    A 2016 study examined 2,041 cases with epithelial ovarian cancer and 2,100 age-and-residence-matched controls. Overall, genital talc use was associated with an OR (95% CI) of 1.33 (1.16, 1.52), with a trend for increasing risk by talc-years. In addition, subtypes of ovarian cancer more likely to be associated with talc included invasive serous and endometrioid tumors and borderline serous and mucinous tumors. Premenopausal women and postmenopausal HT users with these subtypes who had accumulated greater than 24 talc-years had ORs (95% CI) of 2.33 (1.32, 4.12) and 2.57 (1.51, 4.36), respectively. Most women in the study reported using Johnson & Johnson's Baby Powder. Among epidemiologic variables, no confounders for the association were identified. Daniel Cramer, et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States,* 27 EPIDEMIOL. 3, 334-346 (2016).

67.    Various meta-analyses conducted have found positive associations between the use of talc in the genital area and ovarian cancer. *See generally* Bernard Harlow et al., *Perineal*

*exposure to talc and ovarian cancer risk,* 80 OBSTET. GYNECOL. 1, 19-26 (1992); Andrew

Gross, *A meta-analytical approach examining the potential relationship between talc exposure*

*and ovarian cancer,* 5 J. EXPO. ANAL. ENVIRON. EPIDEMIOL. 2, 181-195 (1995); Michael

Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian*

*cancer: a meta-analysis of 11,933 subjects from sixteen observational studies,* 23

ANTICANCER RES. 1955-60 (2003).

### GOVERNMENT AND MEDICAL ORGANIZATIONS' AWARENESS OF TALC USAGE'S CONNECTION TO OVARIAN CANCER

68.    In or about 1993, the United States National Toxicology Program ("NTP") published a

study on the toxicity of non-asbestos form talc and found clear evidence of carcinogenic activity.

Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

69.    On November 17, 1994, the Cancer Prevention Coalition, Chair and National Advisor of

the Ovarian Cancer Early Detection and Prevention Foundation ("OCEDPF") and OCEDPF

members filed a "Citizen Petition Seeking Carcinogenic Labeling on All Cosmetic Talc

Products." The petition noted research dating back to 1961 establishing that cosmetic grade talc

could translocate to the ovaries in women and increase the risk ovarian cancer development. This

petition was submitted to the Commissioner of the Food and Drug Administration ("FDA")

under the Federal Food, Drug, and Cosmetic Act. The petition requested the FDA:

"[i]mmediately require cosmetic talcum powder products to bear labels with a warning such as

'Talcum powder causes cancer in laboratory animals. Frequent talc application in the female

genital area increases the risk of ovarian cancer.'"

70.    In February of 2006, the International Association for the Research of Cancer ("IARC")

part of the World Health Organization published a paper classifying perineal use of talc-based

body powder as a "Group 2B" human carcinogen. IARC found that between 16-52% of women

in the world were using talc to dust their perineum. IARC, universally accepted as the international authority on cancer, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc, ranging from 30-60%. IARC concluded "[p]erineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B)."

71.     In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). To compare, asbestos is also classified as "D2A."

72.     In May 2008, the CPC, joined by its chairman, physicians and chairs of public health and medical associations, submitted a citizen's petition "seeking a cancer warning on cosmetic talc Products."[2] The petition sought to require all cosmetic talc Products to bear labels with warnings such as, "[f]requent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer" or "[f]requent talc application in the female genital area is responsible for major risks of ovarian cancer." The petition cited numerous studies and publications and sought a hearing to present scientific evidence.

73.     In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their groin area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc Products in that area.

---

[2] The petition was submitted on behalf of: Samuel S. Epstein, M.D., Chairman, CPC, and Professor emeritus Occupational and Environmental Medicine, University of Illinois at Chicago School of Public Health; Peter Orris, M.D., Professor and Chief of Service, University of Illinois at Chicago Medical Center; Quentin Young, M.D., Chairman, Health and Medicine Policy Research Group, Chicago; Rosalie Bertell, Ph.D., International Association for Humanitarian Medicine, Scientific Advisor to the International Institute of Concern for Public Health, Toronto, and the International Science Oversight Board of the Organic Consumers Association, Washington, D.C.; and Ronnie Cummins, National Director of the Organic Consumers Association.

74.   The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology at University of Vermont publish a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

75.   As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a "risk factor" for ovarian cancer.

## DEFENDANTS RECOGNIZE THAT TALC USAGE IS LINKED TO OVARIAN CANCER

76.   Upon information and belief, shortly after Dr. Cramer's 1982 study was published, Dr. Bruce Semple of Johnson & Johnson contacted and visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a warning on its talcum powders about the ovarian cancer risks so that women can make an informed decision about their health.

77.   The Johnson & Johnson Defendants publicly recognized the studies linking the use of its Products to ovarian cancer. On August 12, 1982, in a New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive", the Johnson & Johnson Defendants admitted being aware of the 1982 Cramer article that concluded women who apply talc daily to their genital areas were three times more likely to contract ovarian cancer.

78.   Upon information and belief, in response to the United States National Toxicology Program's 1993 study, the Cosmetic Toiletry and Fragrance Association ("CTFA"), now known as the Personal Care Products Council ("PCPC"), reconvened the Talc Interested Party Task Force ("TIPTF"). The TIPTF was originally formed by the CTFA in the 1980's to defend talc in response to the first epidemiologic studies that found an association

between ovarian cancer and genital talc use. Johnson & Johnson Defendants and Luzenac, now known as lmerys, were the primary actors and contributors to the TIPTF.

79.     The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. TIPTF hired scientists to perform biased research regarding the safety of talc. Upon information and belief, TIPTF lobbied various organizations including the NTP to prevent talc from being labeled as a carcinogen. Members of TIPTF, including Johnson & Johnson and Luzenac, edited reports of the scientists hired by this group before they were submitted to governmental agencies and/or released to the consuming public. Members of TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. These activities were conducted by these companies and organizations, including the Johnson & Johnson Defendants, PCPC, and Luzenac over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer.

80.     At all times relevant, PCPC coordinated the defense of talc and acted as a mouthpiece for the members of the TIPTF, including the Defendants. Upon information and belief, PCPC was funded by the annual dues of its members including Defendants.

81.     Since approximately 1973, the Cosmetic Ingredient Review ("CIR") has reviewed the safety of ingredients used in the cosmetic and personal care Products industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC and its employees are paid by PCPC.

82.     Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry, but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1800 ingredients to be "safe as used."

83.     Even though PCPC knew of the safety concerns surrounding talc for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process the Johnson & Johnson Defendants, PCPC and Luzenac influenced the scientists working on the review and ultimately edited the reviews in a biased manner. Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

84.     On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter to then Johnson & Johnson CEO, Ralph Larson, informing Johnson & Johnson Defendants that studies as far back as 1960's "show… conclusively that the frequent use of talcum powder in the genital area poses a serious risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School as confirmation, quoting a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer, as it is very difficult to detect with a low survival rate. The letter concluded by requesting that Johnson & Johnson Defendants withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they posed.

85.     Upon information and belief around 1996, the FDA requested the condom industry to stop dusting condoms with talc due to health concerns linking talc to ovarian cancer. Subsequently, all U.S. manufacturers discontinued the use of talc in condom manufacturing, to

reduce potential health hazards for women.

86.    On September 17, 1997, Alfred Wehner a toxicology consultant retained by

Johnson & Johnson Defendants, wrote a letter to Michael Chudkowski, manager of Pre-

Clinical Toxicology at Johnson & Johnson Consumer, stating that on three separate occasions

TIPTF had released false information to the public about the safety of talc. Specifically

addressing a November 17, 1994, statement released by the CTFA, Dr. Wehner said the

following:

> The response statement dated November 17, 1994, is just as bad.
> The second sentence in the third paragraph reads: 'The workshop
> concluded that, although some of these studies suggested a weak
> association might exist, when taken together the results of the
> studies are insufficient to demonstrate any real association.' This
> statement is also inaccurate, to phrase it euphemistically. At that
> time there had been about 9 studies (more by now) published in the
> open literature that did show a statistically significant association
> between hygienic talc use and ovarian cancer. Anybody who denies
> this risks that the talc industry will be perceived by the public like it
> perceives the cigarette industry: denying the obvious in the face of
> all evidence to the contrary.
>
> The workshop did not conclude that 'the results of the studies are
> insufficient to demonstrate any real association.' As pointed out
> above, a "real" statistically significant association has been
> undeniably established independently by several investigators,
> which without doubt will be readily attested to by a number of
> reputable scientists/clinicians, including Bernard Harlow, Debra
> Novotny, Candace Sue Kasper, Debra Heller, and others.

87.    In 2002, Edward Kavanaugh, CTFA President, wrote a letter to Dr. Kenneth Olden,

NTP Director, in an attempt to stop the NTP from listing cosmetic talc as a carcinogen in

an upcoming report. The NTP had already nominated cosmetic talc for this classification.

Upon information and belief, in this letter the CTFA admitted that talc was "toxic", that

"some talc particles . . . can reach the human ovaries", and acknowledged that prior

epidemiologic studies have concluded that talc increases the risk of ovarian cancer in women.

88.    In 2006, Imerys began placing an ovarian cancer warning on its talc MSDS, warning talc customers of the IARC classification, the Canadian Government's "D2A" classification of talc and "States Rights to Know." At the very least, Johnson & Johnson Defendants would have received these MSDS. The Johnson & Johnson Defendants never passed this warning information on to the consumers.

89.    On September 26, 2012, Imerys' corporate representative testified in open court that his company exclusively supplied Johnson & Johnson Defendants with talc used in the latter's Baby Powder Products, and that ovarian cancer is a potential hazard associated with a women's perineal use of talc-based body powders, like Johnson's Baby Powder.

90.    On October 19, 2012, Johnson & Johnson Defendants' former in-house toxicologist and current consulting toxicologist, Dr. John Hopkins, testified on Johnson & Johnson Defendants' behalf that they "[are] and were  aware of ...  all publications related to talc use and ovarian cancer."

**DEFENDANTS FAILED TO WARN CONSUMERS**

91.    The Johnson & Johnson Defendants had a duty to know and warn about the hazards associated with the use of Johnson's Baby Powder.

92.    A Johnson & Johnson Technology Forecast, dated 1986, acknowledged that safety of cosmetic powders were a concern and that health professionals had decided that powders provide no health benefit. The document also acknowledged that "Retrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer."

93.    Despite the mounting scientific and medical evidence regarding talc use and

ovarian cancer development over the past several decades, none of Johnson & Johnson Defendants' warnings on the Products labels or in other marketing informed Ms. Dawn Crosby-Korzeniowski, or similarly situated individuals, that use of the Products in the genital area could lead to an increased risk of ovarian cancer. For example, the only warnings on the Baby Powder label are to "[k]eep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." Johnson & Johnson Defendants provide similar warnings on their website: "[f]or external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

94.     The Johnson & Johnson Defendants continue to represent on the labeling and in their marketing that Johnson's Baby Powder has "clinically proven mildness", is "clinically proven to be safe, gentle and mild", and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer reviewed studies."

95.     Johnson & Johnson was also aware of the high rate of usage among African Americans (52%) and among Hispanics (37.6%). Despite its knowledge of the increased risk of ovarian cancer, Johnson & Johnson targeted these populations in its marketing efforts.

96.     The Johnson & Johnson Defendants failed to inform its customers and end users of Johnson's Baby Powder of a known catastrophic health hazard associated with the use of those Products.

97.     In addition, the Johnson & Johnson Defendants procured and disseminated false,

misleading, and biased information regarding the safety of its Products to the public.

98.    As a result of the Johnson & Johnson Defendants calculated and reprehensible

conduct, the Plaintiff was injured and suffered damages, namely ovarian cancer which has

required surgery and treatments.

99.    The Johnson & Johnson Defendants had the ability to and did spend enormous

amounts of money marketing and promoting profitable drug, notwithstanding the known

or reasonably known risks. Plaintiff and medical professional could not have afforded, and

could not have possibly conducted studies to determine the nature, extend and identify of

related health risks, and were forced to rely on the Johnson & Johnson Defendants'

representations.

100.    At all pertinent times, a feasible alternative to the talcum powder used in Johnson's

Baby Powder has existed. Cornstarch is an organic carbohydrate that is quickly broken

down by the body with no known health effects. Cornstarch powders have been sold and

marketed for the same uses with similar effectiveness as talcum powder.

101.    Hereinafter, the products at issue in this litigation, Johnson's Baby Powder and

Shower to Shower, shall be called the "Products."

## ASBESTOS CONTAMINATION

102.    If the scientific connection between talc alone was not enough (and it is), the J&J

Defendants' talcum powder products, including Baby Powder, are also contaminated with

asbestos.  The J&J Defendants have known this fact for decades.

103.    Like talcum powder exposure, asbestos exposure is also a known risk factor for

ovarian cancer.

104.    Asbestos is a known contaminant of talc mines. Natural talc formation is commonly

accompanied by veins of other minerals, including asbestiform minerals like tremolite and serpentine.  Hence, there is often asbestos in talc deposits.

105.   The J&J Defendants purchased talc mined first in Vermont, and then from China. In Vermont, the original owners were Rio Tinto Group, then a subsidiary of Rio Tinto, Luzenac America, Inc., which was purchased by in 2001.  Imerys, or its predecessors in interest, at all times relevant, was responsible for the mining and manufacture of the talc used in J&J Defendants Baby Powder products.  Imerys was also responsible for the mining and manufacturing of the talc imported from China.

106.   Throughout the relevant time period, the J&J Defendants supplied talc for Baby Powder from several mines in Vermont, including the Argonaut, Hammondsville and Rainbow mines in Windsor County, and the Hamm Mine in Windham County.  The talc in these mines occurred in the same geologic environment as asbestos.  Thus, when the talc was mined and when it became Johnson's Baby Powder, it was contaminated with asbestos.

107.   Defendants knew, or in the exercise of reasonable care should have known, that the talc mined for use with its talcum powder product could be contaminated with asbestos fibers. Documents from both the Defendants and non-defendant Imerys show that the companies tested the mines for and found asbestos in them.  Similarly, the Cosmetic, Toiletry, and Fragrance Association (discussed infra in more detail) studied talc from the Vermont mines (and some Italian mines) in the 1970s and found high percentages of asbestos fibers in the talc. Defendants were involved in, sponsored, and were aware of these tests.

108.   Defendants knew, or in the exercise of reasonable care should have known, that Plaintiff would come into contact with and be exposed to their talcum powder product that is contaminated with asbestos and would inhale or ingest asbestos dust and fibers as a result of the

ordinary and foreseeable use of Defendants' asbestos products.

109.   Defendants knew, or in the exercise of reasonable care should have known, that the use of their talcum powder contaminated with asbestos would cause asbestos dust and fibers to be released into the air and would create dangerous and unreasonable risk of injury to the lungs, respiratory systems, larynx, stomach, ovaries and other bodily organs of users of their products and to others breathing that air and by coming into contact with that dust in their perineal region.

110.   Defendants failed to provide reasonably safe and sufficient safeguards to detect and remove asbestos from its products in order to protect Plaintiff from being injured, poisoned, disabled, killed or otherwise harmed by using, handling, or coming into contact with and being exposed to Defendants' asbestos-containing talcum products, or by inhalation or ingestion of the asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' products.

111.   Defendants ignored and suppressed medical and scientific information, studies, tests, data and literature which Defendants acquired during the course of their normal business activities concerning the contamination of their talcum powder with asbestos.

## MS. DAWN CROSBY-KORZENIOWSKI'S HISTORY OF JOHNSON'S BABY POWDER AND SHOWER TO SHOWER USE

112.   Prior to her diagnosis, Ms. Dawn Crosby-Korzeniowski purchased the Products and used them daily in and around her vaginal area, and breasts. She used the products on a daily basis from her 20's through her 30's. While a citizen and resident of the Commonwealth of Massachusetts, and a citizen and resident of the County of Plymouth and the County of Bristol, Ms. Dawn Crosby-Korzeniowski used Johnson's Baby Powder and Shower to Shower in accordance with the instructions for use in a reasonably foreseeable manner. Additionally,

Ms. Dawn Crosby-Korzeniowski used the Products while she was a citizen and resident of the State of Rhode Island. Her use of the Products during this time was also done so in accordance with the instructions for use in a reasonably foreseeable manner.

113.   In August 2020, Ms. Dawn Crosby-Korzeniowski was diagnosed with Stage II ovarian cancer and underwent an exploratory laparotomy, bilateral salpingo-oophorectomy, modified radical hysterectomy, surgical staging with omentectomy, bilateral pelvic and para-aortic lymph node dissection, tumor debulking, cystoscopy, right ureterolysis for said ovarian cancer, as a direct and proximate result of the unreasonably dangerous and defective nature of talcum powder, the main ingredient of Johnson's Baby Powder and Shower to Shower, and Johnson & Johnson Defendants, and Imerys' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of the Products.

## FIRST CAUSE OF ACTION
## NEGLIGENT FAILURE TO WARN

114.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

115.   Defendants formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, advertised, manufactured, sold, distributed, marketed, and promoted the Products for use all over a woman's body, including application to a woman's perineal and perineum areas.

116.   Defendants had a duty under Massachusetts State law to exercise reasonable care to provide adequate warning about the risks and dangers of the Products in their  normal and intended uses, which were known or knowable to Defendants at the time of distribution, including use of the Products in women's perineal and perineum areas and directly on

undergarments.

117. Defendants had a continuing duty under Massachusetts law, to warn of risks discovered following the marketing and sale of the Products.

118. Defendants breached their duty in that they failed to warn Ms. Dawn Crosby-Korzeniowski and those similarly situated of the increased risk of ovarian cancer by the Products' use on the perineal and/or perineum areas, by not reporting the risk of serious injury and/or illness and life-altering complications described herein that Defendants knew or should have known were associated with the Products prior to and during the time of Ms. Dawn Crosby-Korzeniowski's use.

119. Specifically, Defendants breached these duties and violated state law by, *inter alia:*

   a. At all pertinent times, non-Defendant lmerys knew the talc mined, milled, and silled was defective at distribution and sale to Johnson & Johnson Defendants. Upon information and belief, the talc Imerys mined, milled, and silled for Johnson & Johnson Defendants was created to the specifications mandated by contract with the Johnson & Johnson Defendants.

   b. At all pertinent times, the Johnson & Johnson Defendants were engaged in the manufacturing, marketing, testing, promotion, selling and/or distributing the Products in the regular course of business.

   c. At all pertinent times, the Johnson & Johnson Defendants knew or in the exercise of reasonable care should have known that the use of talc-based Products in the perineal and/or perineum area significantly increases the risk of ovarian cancer based upon scientific knowledge dating back to the 1960's.

   d. At all pertinent times, a mechanically and financially feasible alternative design was readily available. This Product, a cornstarch powder, was eventually produced by the Johnson & Johnson Defendants.

120. At all pertinent times, including the time of sale and consumption, the Products were unreasonably dangerous and in a defective condition, given the Defendants'

knowledge that Johnson Baby Powder was carcinogenic and could lead to an increased risk of ovarian cancer when applied to the perineal area and undergarments, a reasonable foreseeable use of the Products. Defendants failed to provide adequate warnings or instruction to consumers, including Ms. Dawn Crosby-Korzeniowski, regarding the increased risk of ovarian cancer associated with the use of the Products in the perineal or perineum areas and on undergarments. Defendants failed to properly and adequately warn and instruct Ms. Dawn Crosby-Korzeniowski as to the risks and benefits of the Products in light of her right and need for this information.

121.    Despite the fact that evidence existed that the use of the Products was dangerous and likely to place users at serious risk to their health, such as ovarian cancer, Defendants failed to disclose and warn of this latent health hazard associated with the Products. Instead, Defendants marketed, advertised, and promoted the Products while failing to warn or otherwise ensure the safety of its users in violation of Massachusetts state law.

122.    Defendants had the ability and the duty under state law to disclose its knowledge of adverse events to healthcare providers and the public to ensure its labeling and the Products were not misbranded.

123.    Had Defendants timely and adequately reported the risks associated with the use of the Products near women's perineal and perineum areas by address via print, radio, television, social media, and the internet to the public, the government, healthcare professionals, and consumers like Ms. Dawn Crosby-Korzeniowski, would have been adequately warned. Through such communications, additional information would have been available to the public, including Ms. Dawn Crosby-Korzeniowski, regarding the dangers of talc use that were known or knowable to Defendants at the time of distribution.

124.    Defendants' delay in timely reporting the Products' known complications prevented Ms. Dawn Crosby-Korzeniowski from having timely information concerning the risks associated with the use of talc in women's perineal and perineum areas, like ovarian cancer.  Had Ms. Dawn Crosby-Korzeniowski received timely and adequate information of this serious risk, she would not have used the Products in this reasonably foreseeable fashion.

125.    Defendants could have included this information in its labeling, advertisements, or other means of communicating with the general public and consumers, which Ms. Dawn Crosby-Korzeniowski would have relied upon, but Defendants chose not to include such means of communication.

126.    Indeed, if Ms. Dawn Crosby-Korzeniowski had been adequately warned of these serious risks and adverse events, she would not have used the Products to powder her perineal and perineum areas. As a proximate and legal result of Defendants' failure to properly warn, Defendants breached their duty of care to Ms. Dawn Crosby-Korzeniowski under state law and caused her suffering, including severe physical injuries, severe emotional distress, mental anguish, and economic loss for which Plaintiff is entitled to compensatory and other damages in an amount to be proven at trial. Defendants' negligent failure to warn was a substantial contributing factor in causing Ms. Dawn Crosby-Korzeniowski's injuries, which were a reasonably foreseeable consequence of their conduct.

127.    **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

128.     Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs of this Complaint as if fully set forth herein and further

alleges as follows:

129.     Defendants are merchants with respect to goods of the kind the Plaintiff, Ms.

Crosby-Korzeniowski, received. Defendants impliedly warranted that their Products were

merchantable. Defendants impliedly warranted that their Products were fit for the particular

purpose of being used safely all over a woman's body. Ms. Dawn Crosby-Korzeniowski relied

on Defendants' skill, judgment and superior access to the device's risk profile when deciding to

use the Products.

130.     Defendants' Products were not fit for the ordinary purpose for which such goods were

used, including the powdering of women's perineal and perineum regions. The Products were

defective in design, failed to include adequate warnings and instructions, and were

unreasonably dangerous. Defendants' Products were dangerous to an extent beyond the

expectations of ordinary consumers with common knowledge of the Products' characteristics,

including Ms. Dawn Crosby-Korzeniowski.

131.     In accordance with Massachusetts state law, Defendants owed the public, including

Ms. Dawn Crosby-Korzeniowski, a duty to use reasonable care to manufacture the Products

free of any defects. Defendants also owed a duty to provide adequate warnings reasonably

necessary to advise users like Ms. Dawn Crosby-Korzeniowski of any dangers inherent in the

use the Products, including increased risk of ovarian cancer when the Products is used in a

women's perineal and/or perineum areas.

132.     The Products were defective at the time of sale and distribution, and at the time it left

the possession of Defendants, in a multitude of ways, *inter alia:*

    a.  inadequate warning when the Products were first placed in the stream of commerce regarding the dangers associated with their use in the normally proscribed manner for consumers, like Ms. Dawn Crosby-Korzeniowski;

    b.  the Products contained unreasonably dangerous design defects when first placed into the stream of commerce and were not reasonably safe for intended uses, including dusting the perineal area or perineum, subjecting Ms. Dawn Crosby-Korzeniowski to risks that exceeded the benefits of use;

    c.  the Products were defective in design and formulation when placed in the stream of commerce, because they contained talc, making use more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with use of other non-talc options on the market;

    d.  the Products were insufficiently tested;

    e.  the Products caused harmful side effects, including ovarian cancer, that outweighed any potential utility of deodorizing, preventing chaffing or other possible benefits;

    f.  the Products were not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Ms. Dawn Crosby-Korzeniowski, of the full nature and extent of the risks and side effects associated with their use, thereby rendering Defendants' liable; and

    g.  the failure to provide any warning whatsoever against use of the Products in and around women's perineal and perineum areas or on undergarments.

133.  Defendants failed to warn Ms. Dawn Crosby-Korzeniowski of the risk of serious health risks incidents, including ovarian cancer, described herein rendering the Products defective and unreasonably dangerous.

134.  The Products manufactured and sold by Defendants were defective and unreasonably dangerous due to inadequate warnings and instructions because Defendants knew or should have known that the Products created, among other things, a higher than expected risk of ovarian cancer for women using the Products in their perineal and/or perineum areas, and

Defendants failed to adequately warn of those risks, to monitor those risks, report them and update its labeling regarding such risks when the Defendants had knowledge dating back to the 1960's that the Products increased the risk of ovarian cancer when used in women's perineal and perineum regions.

135.    At all relevant times, the Products were used by Ms. Dawn Crosby-Korzeniowski as intended by Defendants and in a manner reasonably foreseeable to them.

136.    The Products manufactured, marketed, advertised, promoted, and sold by Johnson & Johnson Defendants were expected to, and did, reach Ms. Dawn Crosby-Korzeniowski without substantial change to the condition in which it was sold.

137.    Despite the fact that evidence existed that the use of the Products in a woman's perineal and/or perineum area was unreasonably dangerous and likely to place users at serious risk to their health, Defendants failed to monitor and warn of the health hazards and risks associated with the Products.

138.    Defendants were also required to provide adequate warnings to consumers, like Ms. Dawn Crosby-Korzeniowski, under Massachusetts State law, but failed to do so in a timely and responsible manner.

139.    The defective warnings were the but for and proximate cause in bringing about the injuries to Ms. Dawn Crosby-Korzeniowski that would not have occurred but for the use of the Products.

140.    The Products, which were manufactured, distributed, tested, sold, promoted, marketed, advertised, and represented defectively by Defendants, were a substantial contributing factor in bringing about Ms. Dawn Crosby-Korzeniowski's injuries.

141.    At all times pertinent, there were practical and feasible alternative designs,

including cornstarch-based powders that would have prevented and/or significantly reduced the risk of Ms. Dawn Crosby-Korzeniowski's injuries, without impairing the reasonably anticipated or intended function of the Products. These safer alternative designs were economically and technologically feasible and would have prevented and/or significantly reduced the risk of Ms. Dawn Crosby-Korzeniowski's injuries without substantially impairing utility.

142.   As a proximate result of the defects in the Products at the time they were sold, the Products were rendered unreasonably dangerous and unfit for their ordinary purpose, as the manufacturing defects resulted in the increased risk of ovarian cancer when the Products were applied in a women's perineal and perineum regions. As a proximate result of the Products' defective condition at the time they were sold, Ms. Dawn Crosby-Korzeniowski suffered severe physical injuries, severe emotional distress, mental anguish, and economic loss for which Plaintiffs are entitled to compensatory and other damages in an amount to be proven at trial. Defendants' breach of implied warranty was a substantial contributing factor in causing Ms. Dawn Crosby-Korzeniowski's injuries, which were a reasonably foreseeable consequence of their conduct.

143.   **Wherefore,** Plaintiffs prays for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## THIRD CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

144.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as

follows:

145.    The Johnson & Johnson Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated uses, including use by women on the perineal area and/or perineum. Ms. Dawn Crosby-Korzeniowski was a person whom Johnson & Johnson Defendants would reasonably have expected to use, consume, and/or be affected by the Products.

146.    Plaintiff, Ms. Dawn Crosby-Korzeniowski, saw these advertisements, including television commercials, and believed the Products were safe and effective to use in her perineal area, leading to her purchase them.

147.    The Products did not conform to these express representations in violation of State law, as any warranty statements must be truthful, accurate and not misleading, because the Products were unsafe for the reasonably foreseeable use and consumption of the Plaintiff, due to the increased risk of ovarian cancer when they are applied to women's perineal area or perineum.

148.    As a direct and proximate result of Johnson & Johnson Defendants' breach of express warranty, Ms. Dawn Crosby-Korzeniowski purchased and used the Products, causing her to develop ovarian cancer.

149.    **Wherefore,** Plaintiffs prays for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## FOURTH CAUSE OF ACTION
## NEGLIGENE

150.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the

preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

151.   At all pertinent times, Johnson & Johnson Defendants had a duty to exercise reasonable care in the design, manufacture, test, inspection, packaging, labeling, distribution, marketing, examination, maintenance, supply, provision of proper warnings and preparation for use of the Products.

152.   At all pertinent times, Johnson & Johnson Defendants knew or in the exercise of reasonable care should have known that the Products were of such a nature that they were not properly designed, manufactured, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared and/or provided with the proper warnings, and were unreasonably likely to injure users.

153.   Johnson & Johnson Defendants were aware of the probable consequences of the Products' use in women's perineal and perineum areas. Johnson & Johnson Defendants knew or in the exercise of reasonable care should have known the Products would cause serious injury, and they failed to disclose the known or knowable risks associated with the Products, including ovarian cancer. Johnson & Johnson Defendants willfully and deliberately failed to avoid those consequences, and in doing so, acted in conscious disregard of the safety of Ms. Dawn Crosby-Korzeniowski.

154.   Johnson & Johnson Defendants owed a duty to Ms. Dawn Crosby-Korzeniowski to adequately warn her of the risks of ovarian cancer associated with the Products and the resulting harm it would cause.

155.   Johnson & Johnson Defendants breached their duty by failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the Products, including, but not limited to the following ways, each of which is a proximate

cause of Ms. Dawn Crosby-Korzeniowski's injuries:

    a.  failing to warn Ms. Dawn Crosby-Korzeniowski of the hazards associated with the use of the Products, including the risk of ovarian cancer when the Products are used in the genital area, in the perineal area or on sanitary napkins;

    b.  failing to properly test the Products to determine adequacy and effectiveness or safety measures, if any, prior to releasing them for consumer use;

    c.  failing to properly test the Products to determine the increased risk of ovarian cancer resulting from normal and/or intended use;

    d.  failing to inform ultimate users, such as Ms. Dawn Crosby-Korzeniowski as to the safe and proper methods of handling and using the Products;

    e.  failing to remove the Products from the market or adding proper warnings when the Johnson & Johnson Defendants knew or in the exercise of reasonable care should have known the Products were defective;

    f.  failing to instruct the ultimate user, such as Ms. Dawn Crosby-Korzeniowski, as to methods for reducing the type of exposure to the Products which led to increased risk of ovarian cancer;

    g.  failing to inform the public in general, and Ms. Dawn Crosby-Korzeniowski in particular, of the known dangers of using the Products for dusting the perineum and sanitary napkins;

    h.  failing to advise users how to prevent or reduce exposure that caused increase ovarian cancer risk;

    i.  marketing and labeling the Products as safe for all uses despite knowledge to the contrary; and

    j.  failing to act like a reasonably prudent company under similar circumstances.

156.    Johnson & Johnson Defendants so negligently and carelessly designed,

manufactured, tested, failed to test, inspected, failed to inspect, packaged, labeled,

distributed, recommended, displayed, sold, examined, failed to examine and supplied the

Products, that the Products were dangerous and unsafe for the use and purpose for which they were intended.

157.    At all pertinent times, the Johnson & Johnson Defendants knew or in the reasonable exercise of reasonable care should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated uses.

158.    The Products, which were manufactured, distributed, tested, sold, promoted, marketed, advertised, and represented defectively by Johnson & Johnson Defendants, were a substantial contributing factor in bringing about Ms. Dawn Crosby-Korzeniowski's injuries.

159.   As a direct and proximate result of Johnson & Johnson Defendants' negligence, Ms. Dawn Crosby-Korzeniowski purchased and used the Products that caused her to develop ovarian cancer, incur medical bills, and conscious pain and suffering. As a proximate result of Johnson & Johnson Defendants' negligence, Ms. Dawn Crosby-Korzeniowski suffered and severe emotional distress, mental anguish, and economic loss, for which Plaintiffs are entitled to compensatory and other damages in an amount to be proven at trial. Johnson & Johnson Defendants' negligence was a substantial contributing factor in causing Ms. Dawn Crosby-Korzeniowski's injuries, which were a reasonably foreseeable consequence of their conduct.

160.   **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## FIFTH CAUSE OF ACTION
## GROSS NEGLIGENE

161.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

162.   The Defendants' conduct was in conscious and intentional disregard for the rights, safety and welfare of the Plaintiff, Ms. Dawn Crosby-Korzeniowski, and those similarly situated.  The Defendants acted with reckless, willful and wanton disregard for the safety of Plaintiff, Ms. Dawn Crosby-Korzeniowski, and those similarly situated by continuously and systematically since Johnson's Baby Powder's inception, marketing, manufacturing, advertising, promoting, and selling the product to women for use in the perineal and perineum area, knowing that that use will lead to serious and life-threatening health problems like ovarian cancer.

163.   The Johnson & Johnson Defendants have a pattern and practice of this type of conduct.  Specifically, these Defendants built their company on the credo, "[w]e believe our first responsibility is to the doctors, nurses, and patients, to mothers and fathers and all others who use our product and services."  The Defendants placed emphasis on shareholders believing that if they take care of everything the ethical and correct way profits will follow.  However, over the past few decades, the Defendants have sharply deviated from their original credo, and instituted a corporate pattern and practice of placing profits over the health and wellbeing of its customers as evidence in the Propulsid litigation, Ortho Evra litigation, 2006 Pennsylvania Tylenol litigation, 2006 TMAP investigation, and 2007 violation of the Foreign Corrupt Practices Act.

164.   The above listed evidence indicated a pattern and practice of Johnson & Johnson Defendants to place corporate profits over health and wellbeing of its customers.  Such a pattern and practice has been followed by the Defendants regarding Johnson's Baby Powder and

Shower to Shower products.

165.    As a direct and proximate result of the Defendants' reckless, willful and wanton

disregard for the safety of the Products, amounting to gross negligence, Plaintiff, Ms. Dawn

Crosby-Korzeniowski, sustained damages including injuries and illnesses.  Plaintiff, Ms. Dawn

Crosby-Korzeniowski, was caused to sustain damages as a direct and proximate result including

medical bills and conscious pain and suffering.

166.    **Wherefore**, Plaintiffs request a judgment against Defendants joint and severally for

compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees

and such further and other relief this Court deems just and appropriate, and demands trial by jury

of all issues raised herein.

**SIXTH CAUSE OF ACTION**
**CONCERT OF ACTION**

167.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in

the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as

follows:

168.    Defendants and/or their predecessors-in-interest knowingly agreed, contrived,

combined, confederated and conspired among themselves to cause injuries, diseases, and/or

illnesses by exposing Ms. Dawn Crosby-Korzeniowski to harmful and dangerous Products.

Defendants further knowingly agreed, contrived, confederated and conspired to deprive Ms.

Dawn Crosby-Korzeniowski of the opportunity of informed free choice as to whether to use the

Products or to expose herself to the dangers associated with them.  Defendants committed the

above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and

dangers associated with the use of the  Products.

169.    In furtherance of said conspiracies, Defendants performed the following overt acts in

the Commonwealth:

    a.  For decades, Defendants individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that ordinary and foreseeable use of the Products by women is unreasonable dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

    b.  Despite the medical and scientific data, literature, and test reports possessed by and available to Defendants, these parties individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously:

        i.  withheld, concealed and suppressed medical information regarding the increased risk of ovarian cancer (as set out in the "Facts" section of this pleading). In addition, on July 27, 2005 the Defendants, as part of TIPTF, corresponded and agreed to edit and delete portions of scientific papers being submitted on their behalf to the United States Toxicology Program in an attempt to prevent talc from being classified as a carcinogen;

        ii.  through TIPTF, Defendants instituted a "defense strategy" to defend talc at all costs. Through TIPTF, Defendants used their influence over the NTP subcommittee, and the threat of litigation against NTP to prevent NTP from classifying talc as a carcinogen on its 10th ROC. According to the Defendants, "... we believe these strategies paid off"; and

        iii.  caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer which Defendants knew were incorrect, incomplete, outdated, and misleading. Specifically, through TIPTF the Defendants collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. In a letter dated September 17, 1997, the Defendants were criticized by their own Toxicologist consultant for releasing this false information to the public, yet nothing was done by the Defendants to correct or redact this public release of knowingly false information.

    c.  By these false and fraudulent representations, omissions, and concealments, Defendants intended to induce Ms. Dawn Crosby-Korzeniowski and others to rely upon false and fraudulent representations, omissions and concealments, and to continue to expose herself to the dangers inherent in the use and exposure to the Product.

170.    Individually and in concert with each other, Defendants participated in a common plan

to commit the torts alleged herein, and each acted tortuously in pursuance of the common plan to protect and promote the health and safety of talc use, to the known detriment of the public, including Ms. Dawn Crosby-Korzeniowski.

171.    Ms. Dawn Crosby-Korzeniowski reasonably and in good faith relied upon false and fraudulent representations, omissions, and concealments made by Defendants regarding the nature of the Products.

172.    As a direct and proximate result of Plaintiff, Ms. Crosby-Korzeniowski's reliance, she sustained damages including severe physical injuries, illness, severe emotional distress, mental anguish, and economic loss.  She was also deprived of the opportunity of informed free choice in connection with the use of exposure to the Products.

173.    **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

### SEVENTH CAUSE OF ACTION
### CIVIL CONSPIRACY

174.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

175.    Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause Ms. Dawn Crosby-Korzeniowski's injuries, diseases, and/or illnesses by exposing her to harmful and dangerous Products. Defendants further knowingly agreed, contrived, confederated and conspired to deprive Ms. Dawn Crosby-Korzeniowski the opportunity of informed free choice as to

whether to use the Products or to expose herself to the stated dangers.  Defendants committed the common tortious wrongs as described herein by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to the Product.

176.    Defendants should have expected their acts and business activities to have consequences within the Commonwealth of Massachusetts particularly when affecting national regulatory agencies or national classifications of talc.

177.    In furtherance of said conspiracies, Defendants performed the following Overt acts in the United States, including in the Commonwealth of Massachusetts:

a.  For decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports that clearly indicated that ordinary and foreseeable use of the Products by women is unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

b.  Despite the medical and scientific data, literature, and test reports possessed by and available to Defendants, they individually, jointly, and in conspiracy with each other, fraudulently, willfully and maliciously:

i.  withheld, concealed and suppressed medical information regarding the increased risk of ovarian cancer from Ms. Dawn Crosby-Korzeniowski, as described above. In addition, on July 27, 2005, Defendants through TIPTF, corresponded about and agreed to edit and delete portions of scientific papers being submitted on their behalf to the United States Toxicology Program in an attempt to prevent talc from being classified as a carcinogen.

ii.  instituted a "defense strategy" through the TIPTF to defend talc at all costs. In furtherance of this defense strategy, Defendants, through the TIPTF, used their influence over the National Toxicology Program ("NTP') Subcommittee and the threat of litigation against the NTP to prevent the NTP from classifying talc as a carcinogen on its 10th Report on Carcinogens ("RoC");

iii.  caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information

and statements regarding the risks of ovarian cancer which Defendants knew were incorrect, incomplete, outdated, and misleading. Specifically, Defendants, through the TIPTF, collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. In a letter dated September 17, 1997, the Defendants were criticized by their own toxicologist consultant for releasing this false information to the public, yet nothing was done by the Defendants to correct or redact this public release of knowingly false information.

c. By these false and fraudulent representations, omissions, and concealments, Defendants intended to induce, and did induce the Plaintiff, Ms. Dawn Crosby-Korzeniowski, to rely upon these false and fraudulent representations, omissions and concealments, and to continually expose herself to the dangers inherent in the use and exposure to the Product.

178.   Defendants knew or in the exercise of reasonable care should have known that the actions alleged above constituted a willful breach of a duty owed to Ms. Dawn Crosby-Korzeniowski and others similarly situated, that the Products were not of safe and marketable use for their intended purpose, and not free of unreasonable dangers to health and safety.

179.   Defendants ratified and adopted each of the foregoing acts and omissions in furtherance of the conspiracy.

180.   Ms. Dawn Crosby-Korzeniowski reasonably and in good faith relied upon the fraudulent representations, omissions, and concealments made by Defendants regarding the nature of the Products.

181.   As a direct, foreseeable and proximate result of the Defendants' conspiracy, Ms. Dawn Crosby-Korzeniowski purchased and used the Products in her perineal areas, which caused her to develop ovarian cancer.

182.   As a direct and proximate result of Plaintiff's reliance, she sustained damages including severe physical injuries, illness, severe emotional distress, mental anguish, and economic loss.

She was also deprived of the opportunity of informed free choice in connection with the use of exposure to the Products.

183.   **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

184.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

185.   Defendants had a duty to exercise reasonable care to accurately and truthfully represent to the medical and healthcare community, the public, and Ms. Dawn Crosby-Korzeniowski that the Products had been tested and found to be safe and effective for use in the perineal area. However, the representations made by Defendants, in fact, were false.

186.   Defendants failed to exercise ordinary care in the representations concerning the Products while it was involved in their manufacturer, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Products' high risk of unreasonable, dangerous, adverse side effects, including the risk of ovarian cancer.

187.   Defendants breached their duty in representing that the Products had no serious side effects, and were safe for use in the perineal and perineum areas.

188.   Defendants have a pecuniary interest in making the false statements regarding the safety of the Products when applied all over a woman's body.

189.   As a foreseeable, direct and proximate result of the negligent misrepresentation of

Defendants as set forth herein, Defendant knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects.

190.   At all relevant times, upon information and belief, the misrepresentations, omissions and concealments concerning the Products made by the Defendants include, but are not limited to the following:

     a.   Despite actual knowledge of the health risks, the Defendants failed to disclose to the consumers and Ms. Dawn Crosby-Korzeniowski, through adequate warnings, representations, labeling or otherwise, that the Products were unreasonably dangerous and carcinogenic in nature, posing serious health risks to consumers;

     b.   Despite actual knowledge that the use of the Products in the perineal area created a significant increase of ovarian cancer, the Defendants failed to disclose to consumers and Ms. Dawn Crosby-Korzeniowski, through adequate warnings, representations, labeling or otherwise, that material fact.

     c.   Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the Products as safe for public consumption and usage, including for use by women to powder their perineal areas.

191.   At all relevant times, Defendants failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of the Products, failed to disclose facts indicating that the Products were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the Products to Ms. Dawn Crosby-Korzeniowski, and concealed relevant facts that were known to them.

192.   At all relevant times, Plaintiff, Ms. Dawn Crosby-Korzeniowski was not aware of the falsity of the foregoing misrepresentations, nor was she aware that material facts concerning talc and the Products has been concealed or omitted.  In reasonable reliance upon the Defendants'

misrepresentations and/or omissions, Plaintiff, Ms. Dawn Crosby-Korzeniowski was induced to and did purchase the Products and did use them on her perineal area.  If the Defendants had disclosed true and accurate material facts concerning the risks of the use of the Products, in particular the risk of developing ovarian cancer from using the Products in the female perineal area, Plaintiff would not have purchased and/or received the Products and/or used the Products in that manner.

193.   Plaintiff, Ms. Dawn Crosby-Korzeniowski's reliance upon the Defendants' misrepresentation and omissions was justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the Products and the association between them and the incidence of ovarian  cancer, while Plaintiff, Ms. Dawn Crosby-Korzeniowski, was not in a position to know these material facts, and because Defendants failed to warn or otherwise provide notice to the consuming public as to the risks of the Products, thereby inducing her to us the Products in lieu of safer alternatives and in ways that created unreasonably dangerous risks to her health.  At all relevant times, the Defendants' corporate officers, directors, and/or managing agents knew of and ratified the acts of the Defendants, as alleged herein.

194.   As a direct and proximate result of Defendants' conduct, Plaintiff, Ms. Dawn Crosby-Korzeniowski, has been injured and sustained severe pain, suffering, loss of enjoyment of life, loss of care and comfort and economic damages.

195.   As a direct, foreseeable and proximate result of the Defendants' fraudulent conduct, Plaintiff, Ms. Dawn Crosby-Korzeniowski, purchased and used the Products in her perineal areas.  As a direct and proximate result of such use, Plaintiff, Ms. Dawn Crosby-Korzeniowski, developed ovarian cancer, and was caused to suffer severe physical injuries, illness, severe emotional distress, mental anguish, and economic loss.

196.   **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for

compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

### NINTH CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION AND OMISSION

197.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

198.     In the course of business, Defendants designed, manufactured and sold the Products, knowing it was reasonable and foreseeable that women would use the Products to powder their perineal and perineum areas.

199.     At all relevant times, Defendants intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers, including Plaintiff.

200.     At all relevant times, Defendants misrepresented and/or concealed material facts concerning the Products to consumers, including Plaintiff, Ms. Dawn Crosby-Korzeniowski, with knowledge of the falsity of their misrepresentations.

201.     Defendants were aware of the dangerous and defective condition of the Products and intentionally withheld this information from Plaintiff, Ms. Dawn Crosby-Korzeniowski, the healthcare field, and the general public even though these significant dangers were not readily obvious to ordinary users.

202.     At all pertinent times and upon information and belief, the misrepresentations and concealments made by the Defendants concerning the Products include, but are not limited to the following:

a.      Falsely labeling and advertising the Products: "[f]ew ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc"; "[w]e continue to use talc in our Product because decades of science have reaffirmed its safety"; "[s]cience, research, clinical evidence, and decades of studies by medical experts around the world continue to support the safety of the cosmetic talc used in Johnson's Baby Powder";

b.      Knowingly misrepresenting to Plaintiff and the public, through the advertisements described above, that the Products were safe for use all over the body, including the perineal and perineum areas;

c.      Intentionally failing to disclose that the Products, when used in the perineal area, increases the risk of ovarian cancer due to the talc;

d.      Intentionally failing to include adequate warnings with the Products regarding the potential and actual risks of using it in the perineal area of women, and the nature, scope, severity, and duration of any serious resulting injuries, including ovarian cancer; and

e.      Despite knowledge regarding the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the Products as safe for public consumption and usage, including for use by women to powder their perineal areas.

203.    Plaintiff justifiably relied upon the aforementioned misrepresentations and concealments made by the Defendants and used the Products as described herein for many years.

204.    As a direct and proximate result of Plaintiff, Ms. Dawn Crosby-Korzeniowski's reliance on Defendants' fraudulent misrepresentations and concealments, she was seriously and permanently injured.

205.    As a direct and proximate result of Plaintiff, Ms. Dawn Crosby-Korzeniowski's reliance, she sustained damages including injuries, and illnesses, and was deprived of the opportunity of informed free choice in connection with the use of and exposure to Johnson & Johnson Defendants' Products. As a direct and proximate result of Plaintiff's use of the Products, she incurred medical bills, conscious pain and suffering.

206.     The conduct of Johnson & Johnson Defendants in continuing to market, promote, sell and distribute the Products while fraudulently concealing knowledge that the Products were failing and not performing as represented and intended, shows a complete indifference to, or conscious disregard for the safety of others justifying an award in such sum which will serve to deter Johnson & Johnson Defendants and others from similar conduct.

207.     **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

<u>**TENTH CAUSE OF ACTION**</u>
<u>**FRAUDULENT CONCEALMENT**</u>

208.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

209.     Prior to Plaintiff, Ms. Dawn Crosby-Korzeniowski's use of the Products and during the period in which she actually used the Products, the Johnson & Johnson Defendants fraudulently suppressed material information regarding the safety and efficacy of the Products and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch-based Product for the same purposes.  Furthermore, the Johnson & Johnson Defendants fraudulently concealed the safety information about the use of talc, generally, and on the perineal area, specifically.  Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this complaint were intentional so as to maintain the sales volume of its talc.

210.     The Johnson & Johnson Defendants intentionally concealed safety issues with talc

generally in order to induce consumers, including Plaintiff, Ms. Dawn Crosby-Korzeniowski, to purchase the Products.

211.   At the time the Johnson & Johnson Defendants concealed the fact that the Products were not safe as designed and marketed, the Johnson & Johnson Defendants were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using the Products, generally.

212.   Plaintiff, Ms. Dawn Crosby-Korzeniowski, relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the Products.

213.   As a direct and proximate result of the Johnson & Johnson Defendants' malicious and intentional concealment of material and information, the Johnson & Johnson Defendants caused or significantly contributed to Plaintiffs' injuries.

214.   The Johnson & Johnson Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to Ms. Dawn Crosby-Korzeniowski and the public.

215.   The Johnson & Johnson Defendants' acts before, during and/or after the act causing Plaintiff's injuries prevented Plaintiff from discovering the injury or cause thereof.

216.   The Johnson & Johnson Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which the Johnson & Johnson Defendants must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Ms. Dawn Crosby-Korzeniowski.

217.   As a direct and proximate result of the Johnson & Johnson Defendant's fraudulent concealment concerning the Products, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they is entitled to recover, including but not limited to

compensatory damages, consequential damages, interest, costs and attorney's fees.

218.    **Wherefore,** Plaintiffs prays for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## ELEVENTH CAUSE OF ACTION
## DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, M.G.L. c. 93A VIOLATIONS

219.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

220.    Defendants engaged in trade and commerce within the Commonwealth of Massachusetts.

221.    The same actions that constitute Defendants' negligence, breach of warranty, breach of implied warranty of merchantability, misrepresentations, fraud and concealment, constitute a violation of M.G.L. c. 93A.

222.    As described herein, Defendants represented that the Products had characteristics, uses and benefits that they did not have.

223.    As described herein, Defendants represented that the Products were of a particular standard, quality, and grade that they either knew or in the exercise of reasonable care should have known was not of the standard, quality, or grade described.

224.    Defendants failed to provide accurate disclosures of all material information before Plaintiff used the Products.

225.    Defendants' willful and knowing withholding of important safety and efficacy

information regarding the Products, including the increased risk of ovarian cancer when applied

on the perinea and perineum areas constitutes a violation of M.G.L. c. 93A, *inter alia:*

> a.      Representing that the Products have uses, benefits or qualities, like maintaining "softness" or "dryness" of the skin when applied directly, when the benefits of such usage is disproportionately outweighed by the significant increase in the likelihood of ovarian cancer when applied in the perineal or perineum regions;

> b.      Representing that the Products are of a particular standard or quality, purportedly safe for use by women in the perineal and/or perineum areas, when Defendants knew or in the exercise of reasonable care should have known that such use would lead to significant increased likelihood of ovarian cancer;

> c.      Continuing to advertise the Products as safe and effective for use all over the body, when Defendants have known from at the least the 1970's that such usage leads to a significant increase in the likelihood of ovarian cancer when it is applied to the perineal and/or perineum areas;

> d.      Consistently engaging in advertising campaigns in the print, radio, web, and cable advertisements promoting the safety of the Products when applied to a women's perineal and/or perineum areas, promoting confusion as mounting scientific literature and evidence says otherwise;

> e.      The Johnson & Johnson Defendants consciously choosing to release false information to the public regarding the safety of talc, leading to confusion and misunderstanding of the dangers surrounding talc use on a women's perineal and/or perineum areas; and

> f.      Otherwise engaging in practices that are unfair and/or deceptive to consumers, including Plaintiff.

226.    Defendants actively, knowingly and deceptively concealed its knowledge of the

Products' dangerous properties and risks and lack of efficacy.  This conduct evidences bad faith

and unfair and deceptive practices.

227.    Defendants engaged in the conduct as described herein that created a likelihood of

confusion and misunderstanding.

228.    The practices described herein are unfair because they offend public policy as

established by statutes, the common law, or otherwise caused substantial injury to consumers.  In

this regard, Defendants engaged in an unconscionable course of action.

229.    Defendants willfully, wantonly, recklessly, and with gross negligence, engaged in the conduct described herein, which it knew was deceptive, in the course of retail business, trade and commerce, and had a deleterious impact on the public interest.

230.    Defendants are liable to Plaintiffs for all statutory, direct and consequential damages, fees and costs, resulting from this unfair and deceptive conduct, including multiple damages.

231.    **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

<u>**TWELFTH CAUSE OF ACTION**</u>
<u>**PUNITIVE DAMAGES**</u>

232.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein. Plaintiffs plead all Counts of this Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles including the law of the Plaintiffs' resident State.

233.    Defendants sold the Products to Plaintiff, Ms. Dawn Crosby-Korzeniowski, and other consumers throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for their intended use.

234.    Defendants sold the Products to Plaintiff, Ms. Dawn Crosby-Korzeniowski, and other consumers throughout the United States in spite of their knowledge that the Products caused the problems heretofore set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by the Plaintiff, Ms. Dawn Crosby-Korzeniowski.

235.    At all times pertinent, Defendants knew or should have known that the Products were

unreasonably dangerous with respect risk of ovarian cancer, loss of life's enjoyment, an effort to cure the conditions proximately related to the use of the Products, as well as other severe and personal injuries which are permanent and lasting in nature.

236.   At all times pertinent, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the Products, including but not limited to information regarding the increased risk of developing ovarian cancer when the Products were used in the perineal area.

237.   Defendants' misrepresentations included knowingly withholding material information from the consumers, including Plaintiff, Ms. Dawn Crosby-Korzeniowski, concerning the safety and efficacy of the Products.

238.   At all times pertinent, Defendants knew and intentionally and/or recklessly disregarded the fact that the Products cause debilitating and potentially lethal side effects with greater frequency than a safer alternative Product.

239.   At all times pertinent, Defendants knew and intentionally and/or recklessly disregarded the fact that the Products cause debilitating and potentially lethal side effects with greater frequency than a safer alternative Product and recklessly failed to advise the public of the same.

240.   At all times pertinent, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the Products.

241.   Notwithstanding the foregoing, Defendants continue to aggressively market the Products to consumers, without disclosing the true risk of side effects.

242.   Defendants knew that the Products were defective and of an unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the Products

so as to maximize sales and profits at the expense of the health and safety of the Public, including Plaintiff, in conscious and/or reckless disregard of the foreseeable harm caused by the Products.

243.    Defendants continue to intentionally conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiff, the serious side effects of the Products in order to ensure continued and increased sales.

244.    Defendants' intentional, reckless and/or grossly negligent failure to disclose information deprived Plaintiff of necessary information to enable her to weigh the true risks of using the Products against the benefits.

245.    As a direct and proximate result of the foregoing wrongful acts and omissions, Plaintiff, Ms. Dawn Crosby-Korzeniowski, has required and will require health care and services, and has incurred, and will continue to incur, medical, health care, incidental, and related expenses.

246.    Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant Common Law principles and the statutory provisions of the Plaintiffs' respective home state and Defendants' home states.

247.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

248.    **Wherefore,** Plaintiffs pray for judgment against Defendants joint and severally for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demand trial by jury of all issues raised herein.

## LOSS OF CONSORTIUM

249.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

250.    Plaintiff, Ms. Dawn Crosby-Korzeniowski, and Plaintiff Spouse, Ms. Alison Crosby-Korzeniowski, were at all times relevant, and continue to be, legally married in accordance with the laws of the Commonwealth of Massachusetts.

251.    Plaintiff Ms. Dawn Crosby-Korzeniowski has suffered injuries and damages as alleged herein. Plaintiff Spouse Ms. Alison Crosby-Korzeniowski was married to the Plaintiff at the time of her injuries from Johnson and Johnson products, and continues to be married to the Plaintiff after she sustained those injuries described herein.

252.    As a direct and proximate result of the injuries and injurious consequences suffered by Plaintiff Ms. Dawn Crosby-Korzeniowski, Plaintiff Spouse Ms. Alison Crosby-Korzeniowski has suffered damages and harm, including but not limited to emotional distress, medical expenses and other economic harm, as well as lost consortium of her spouse, which includes society, services, love comfort, companionship, and affection, and will suffer a loss of these services in the future.

253.    **Wherefore**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4. Pre-judgment interest;

5. Post-judgment interest;

6. Statutory damages as available;

7. Punitive damages as available;

8. Awarding Plaintiffs reasonable attorneys' fees;

9. Awarding Plaintiffs the costs of these proceedings; and

10. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  October 21, 2021                    **RESPECTFULLY SUBMITTED,**

                                            **LAW  OFFICES OF JEFFREY S.
                                            GLASSMAN, LLC**


                                            */s/ Julie E. Lamkin*
                                            Julie E. Lamkin, Esq.
                                            MA BBO# 680482
                                            Robert T. Naumes, Jr., Esq.
                                            MA BBO# 664826
                                            One International Place, 18th Fl.
                                            Boston, MA 02110
                                            (617) 367-2900
                                            (617) 722-9999 (Fax)
                                            jlamkin@jeffreysglassman.com
                                            bnaumes@jeffreysglassman.com

                                            **Attorneys for Plaintiffs**